AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Western District of Arkansas

US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED
AUG - 3 2020
DOUGLAS F. YOUNG, Clerk
By _____
Deputy Clerk

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The Premises Located At 1210 N. 46th Street, Fort<br>Smith, Arkansas | )<br>)<br>)<br>)<br>)<br>) |

Case No. 2:20 CM 69

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____ Western _____ District of _____ Arkansas _____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) | Controlled Substance Offenses |
| 21 U.S.C. 846 | Conspiracy |

The application is based on these facts:

See attached Affidavit of FBI SA Matthew Ferguson.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

MATTHEW FERGUSON *(digitally signed)*

*Applicant's signature*

FBI SA Matthew Ferguson
*Printed name and title*

Sworn to before me and signed in my presence.

Date: August 3, 2020

City and state: Fort Smith, AR

*Judge's signature*

Hon. Mark E. Ford, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT "A"
## DESCRIPTION OF PROPERTY TO BE SEARCHED

**1210 N. 46th Street, Fort Smith, Arkansas**



The **SUBJECT PREMESIS** is described as a single story, single family residence with yellowish-tan siding, white trim and a gray roof. The front door of the residence faces west. The numbers "1210" are posted on a black mailbox in front of the residence. The **SUBJECT PREMESIS** is more commonly known as **1210 N. 46th Street, Fort Smith, Arkansas** which is within the Western District of Arkansas.

## ATTACHMENT "B"

## ITEMS TO BE SEARCHED FOR, SEIZED, AND SEARCHED

### 1210 North 46th Street, Fort Smith, Arkansas

Definitions: The terms "records." "documents." and "materials" include all of the following items of evidence in whatever form and by whatever means such records, documents, or materials, their drafts, or their modifications may have been created or stored, including (but not limited to) any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly), any photographic form (such as microfilm, microfiche, prints, photocopies, electronically stored images), any mechanical form (such as information on an electronic, or magnetic storage device, such as floppy diskettes, backup tapes, CD-ROMs, optical discs, or smart cards, as well as printouts or readouts from any magnetic storage device). The term "records" shall include the content of electronic communications in electronic storage within the meaning of 18 U.S.C. § 2703(a).

1.      Methamphetamine and objects and containers such as packaging, scales, and related paraphernalia used in the distribution, concealment, sale, use and/or transport of methamphetamine.

2.      Cash, currency, and records related to income and expenditures of money and wealth concerning controlled substances, including but not limited to: money orders, wire transfers, credit card records, cashier checks, receipts, bank statements, passbooks, checkbooks, check registers, and safe deposit box keys:

3.      Any and all firearms, to include but not limited to: firearms and firearms parts, including gun cases, ammunition, ammunition magazines, holsters, spare parts for firearms, firearms cleaning equipment, photographs and video tapes of firearms or person(s) in possession of firearms, acquisition or ownership documents, and receipts for the purchase and for repair of all of these items;

4.      Books, records, papers, receipts, documents, notations, diaries, journals, or ledgers, showing the receipt, storage, obtaining, manufacturing, use of items used in the commission of criminal activities as described in paragraph 1 above, and notes of computer passwords, codes, or any other security information or device, in whatever media found;

5.      Receipts, invoices, titles, deeds, and any other documents, which is evidence of expenditures and/or are evidence of items purchased in the commission of criminal activities as described in paragraph 1 above;

6.      Travel records and receipts, bank safe deposit records storage facility records, ledgers, correspondence, telephone books, telephone records, including any records, documents, address books, photographs, and other documents, tending to establish the identity of associates, customers, suppliers, manufacturers of individuals who are engaging in the criminal activities as described in paragraph 1 above;

7.    Books, records, papers, receipts, documents, notations, diaries, journals, or ledgers, showing receipt, expenditure or availability of substantial amounts of currency, cash, or money;

8.    Bank statements, account information in regards to, but not limited to, money market accounts, savings accounts, checking accounts, retirement accounts, deposit slips, withdrawal slips, and canceled checks for and all bank accounts, including certificates of deposit and money market accounts;

9.    Credit card receipts and credit card statements and charge account information;

10.   Photographs depicting assets, firearms, illegal behavior, travel, and/or expenditures;

11.   Electronically stored records showing proof of residence, proof of storage unit use and/or rentals, additional properties owned or documents reflecting straw purchases, real estate transaction documents, rental agreements or documents, as well as automotive sale or purchase or financing documents;

12.   Documents purporting to indicate income or salaries received reflecting employment, hours worked, wages earned, withholdings, W-2 and W-4 forms, (blank or executed), state and federal tax returns or documents pertaining to the preparation thereof;

13.   Records showing secret clientele lists, business associates, diversification of wealth, United States Currency, and firearms related transactions;

14.   Any other electronically or otherwise stored tangible items evidencing the obtaining, transfer, secreting, and/or concealment of assets and/or money;

15.   Records, documents, receipts, and/or negotiable instruments which evidence the purchase of negotiable instruments and/or the structuring of currency transactions to avoid the filing of currency transactions reports and/or the laundering of monetary instruments;

16.   All electronically stored books, records, papers, receipts, ledgers, and journals, or other tangible evidence, recording income, expenditures, assets, and liabilities;

17.   Documents evidencing fruits, instrumentalities, monies, records, and notations, associated with the crimes as described in paragraph 1 above;

18.   Computer Hardware consisting of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Hardware includes any data processing devices (including but not limited to central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including but not limited to keyboards, printer, video display monitors, scanners, digital cameras, and related communications devices such as cables and

connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks);

19.     Uploaded Computer Software such as digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities;

20.     Items which can also be stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment, including floppy diskettes, fixed hard disks, or removable     hard disk cartridges, software or memory in any form, including portable storage media, more particularly described as follows:

> a. Any and all computer-related documentation consisting of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.
>
> b. Any and all computer passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort     of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software digital code     may include a programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well a reverse the progress to restore it.

21.     The phone numbers and/or direct connect and/or names and identities, including electronic mail addresses, usernames and passwords assigned to the cellular telephone devices and computers mentioned above.

22.     Cellular telephones, tablets and portable devices including information stored within the devices including but not limited to: digital, cellular, and/or telephone numbers and/or direct connect numbers, names and identities, including electronic mail addresses, usernames and passwords stored in the above listed cellular telephone devices and computers and in any other electronic media attached to or found with the devices, including but not limited to SIM cards and flash memory cards.

23.     Phone numbers, direct connect numbers, electronic mail addresses contained within the cellular telephone devices and computers listed above, Internet Protocol addresses and other accounts dialed or accessed using the device or otherwise communicating with or accessing the above listed items.

24. Photographs, text messages, electronic mail messages and any other documents or information stored in the memory of the above listed items relating to violations of Title 21 USC § 846 and § 841.

25. Emmanuel Miranda, for whom an arrest warrant was issued in Western District of Arkansas case number 2:20 CR 20014.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

I, the undersigned, being duly sworn, depose and say as follows:

1)      I, Matthew K. Ferguson, hereafter referred to as Affiant, am a Special Agent (SA) of the Federal Bureau of Investigation (FBI). I have been employed as a Special Agent with the FBI since September 2009. Prior to my employment with the FBI, I was employed as a Police Officer and Narcotics Officer by the City of North Little Rock, Arkansas Police Department from 2004 to 2009. I am currently assigned to the FBI Little Rock Division, Fort Smith Resident Agency where I am tasked with conducting criminal enterprise investigations. During my career as a Special Agent, I have been involved in a wide variety of investigative matters, including investigations targeting criminal enterprises involved in the unlawful distribution of controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846.   During the course of these investigations, I have authored and reviewed multiple Title III wire intercept affidavits, coordinated the execution of search and arrest warrants, conducted physical surveillance, participated in controlled purchases with confidential sources, analyzed records documenting the purchase and sale of illegal drugs, and communicated with other local and federal law enforcement officers regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs.   Through my training and experience I have become familiar with the manners in which illegal drugs are imported, distributed, and sold, as well as the methods used by drug dealers to disguise the source and nature of their profits.

2)      The information set forth in this Affidavit is known to me by other law enforcement personnel or through my own investigation.

1

3) For the reasons stated below. I submit that there is probable cause to believe that the residence located at **1210 N. 46th Street, Fort Smith, Arkansas** contains items that constitute evidence, fruits, and instrumentalities of violations of Title 21, United States Code. Section 841(a) (1) (Distribution and possession with intent to distribute a controlled substance). and Title 21, United States Code. Section 846 (Conspiracy to commit controlled substance offense). I further submit that a search of this location will result in the discovery of items that constitute evidence, fruits, and instrumentalities of such activity.

4) Based upon your Affiant's training, experience, shared experience with other agents and officers with whom he has worked. and participation in other investigations involving large amounts of methamphetamine, cocaine. heroin, marijuana and/or other Controlled Dangerous Substances (CDS), your affiant knows the following to be true:

    A. That drug traffickers and co-conspirators often place assets in the names of others to avoid detection by law enforcement. but keep these assets and exercise dominion and control over them:

    B. That drug traffickers and co-conspirators often maintain either on hand or concealed in secure locations. such as in safe deposit boxes. large amounts of U.S. Currency and other negotiable items in order to maintain and finance their ongoing controlled substance business:

    C. That drug traffickers and co-conspirators maintain books. records. receipts. notes, ledgers, money orders, and other papers relating to the purchase and distribution of controlled substances long after the entry in books or ledgers, and maintain these records where they have ready access to them. The records may be contained not only on paper. but also as electronic data in a form of computer hardware and software. Such information is stored on

2

desktop, other personal computers, electronic devices and digital media. It is sometimes impossible for technical reasons to access any subject computer, electronic device or digital media to search for and copy information contained on such electronic devices or digital media. In such instances, it may be necessary to seize and remove subject computer, electronic device, or digital media to a laboratory for a sufficient time to gain access to, search for and recover files and records stored therein;

      D.      That is common for drug traffickers and co-conspirators to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations, within their residence, and to conceal them from law enforcement authorities;

      E.      That persons involved in drug trafficking often conceal in their residences caches of drugs, large amounts of U.S. Currency, financial instruments, and other items of value and/or proceeds of drug transactions relating to obtaining, transferring, secreting or spending of large sums of money made from engaging in drug trafficking;

      F.      That drug traffickers and co-conspirators commonly maintain addresses and telephone numbers in books, papers, or electronic devices which reflect names, addresses, and telephone numbers for their associates in the drug trafficking community;

      G.      That drug traffickers and co-conspirators take or cause to be taken photographs of them, their associates, their property and their products;

      H.      That drug traffickers usually keep firearms in order to protect themselves and their illegal trafficking activities; and

      I.      That drug traffickers often utilize telephones, pagers, and answering machine recordings to facilitate the distribution of drugs which also may contain the identity of persons involved in the conspiracy to distribute and distribution of drugs, and the manner in which

3

those activities are conducted.

    J.   That drug traffickers often utilize outbuildings located on their property as a temporary storage location for controlled substances. Drug traffickers utilize these buildings as a location to remove controlled substances from false compartments, commonly referred to as "traps", in load vehicles.

    K.   That there is probable cause to believe that such items of evidence, which represent the fruits and instrumentalities of said offenses, will be located within the location specified in this application, which is located within the Western District of Arkansas.

**OVERVIEW OF THE INVESTIGATION**

   5)   Special Agents (SA) of the FBI Little Rock Field Office, Fort Smith Resident Agency along with Officers of the Fort Smith Police Department (FSPD) Narcotics Unit and other law enforcement officers are conducting an investigation of a Drug Trafficking Organization (DTO) led by **Emmanuel MIRANDA** (hereafter referred to as **MIRANDA**) and others both known and yet unknown through this investigation. To date, investigating SAs and Officers have identified multiple individuals who are involved in the DTO's illicit drug trafficking and distribution activities.

   6)   Through their investigation, Affiant and other Officers/Agents have positively identified **MIRANDA's** residence as **1210 North 46th Street, Fort Smith, Arkansas** (the **"SUBJECT PREMESIS"** which is further described in Attachment A) which Affiant knows to be located within the Western District of Arkansas. At this location, Affiant believes **MIRANDA** stores, conceals and distributes supplies of methamphetamine; stores and conceals large sums of cash currency which represent proceeds of his illegal drug trafficking activities and drug debts owed to his suppliers; maintains drug paraphernalia related to the use, storage, packaging and

4

distribution of methamphetamine; stores firearms used to protect his drug trafficking activities; and maintains records, documents and other information related to the his participation in the drug conspiracy and related crimes.

7)  **MIRANDA** and others both known and yet unknown through this investigation are known to meet drug customers at the **SUBJECT PREMESIS** to provide them with methamphetamine and conduct firearm transactions with drug customers at these locations and store firearms at these locations.

## **PROBABLE CAUSE**

8)  During the course of this investigation, Agents and Task Force Officers have developed, interviewed and utilized multiple Confidential Sources (CS) who have provided information that has been found to be accurate and reliable and which has been independently corroborated by investigators.

9)  Affiant believes the CSs utilized in this investigation are credible. The information provided by these individuals is consistent with information obtained from other sources in the course of the investigation, including, to the extent practicable, corroboration by independent law enforcement investigation, and it has proven to be accurate. Furthermore, the CSs' knowledge of the drug trade is consistent with Affiant's understanding of the trade and roles within a drug trafficking organization.

10)  In or about July 2019, Confidential Source 1 (CS-1) who has provided information which has been independently corroborated by law enforcement throughout this investigation, provided information leading to the identification of **Emmanuel MIRANDA**, aka "El Mejicano" as an individual who is involved in the trafficking and distribution of methamphetamine in the Fort Smith, Arkansas area which Affiant knows to be located within the Western District of Arkansas.

5

CS-1 is not facing criminal charges at this time and is cooperating with investigators out of a sense of patriotism for the United States and for potential financial gain.

11)     In or about July 2019, Affiant conducted a series of interviews with CS-1 who provided the following information regarding **MIRANDA**: CS-1 was shown the known Arkansas Driver's License photo of **Emmanuel MIRANDA** which he positively identified as an individual he/she knew by the moniker "El Mejicano" and who CS-1 knows to distribute quantities of meth from his residence in Fort Smith, Arkansas. CS-1 has visited **MIRANDA's** residence which was located at 1208 N. 6th Street, Fort Smith, Arkansas (hereafter referred to as the **"PREVIOUS RESIDENCE"**) on multiple occasions and has observed **MIRANDA** and others in possession of distribution quantities of "crystal" methamphetamine at that residence. CS-1 estimated he/she observed five to eight-pound quantities of methamphetamine on at least two occasions in or about late June 2019 to early July 2019. CS-1 further stated he/she observed multiple firearms at the residence to include multiple AR-15 style rifles and a .357 revolver pistol. CS-1 has also visited **MIRANDA's** residence on other occasions when he/she observed methamphetamine packaged in smaller one-ounce quantities for distribution and has observed supplies of methamphetamine secreted in child's toys, including a toy airplane, and stashed throughout the residence.

12)     On or about August 17, 2019, CS-1 discovered **MIRANDA** was attempting to obtain a large sum of money in order to pay for his recently deported brother (identified through this investigation as **Israel MIRANDA-ZAPATA**) to return to the United States. (Through this investigation, Affiant knows **Israel MIRANDA-ZAPATA** was arrested and removed from the United States by Homeland Security ICE ERO in April 2019 in the Western District of Arkansas.) Later, CS-1 obtained prices for various quantities of methamphetamine from **MIRANDA**.

6

13) On or about August 20, 2019, CS-1 was instructed by Affiant and other investigators to conduct a consensually monitored and recorded telephone call with **MIRANDA** in order to arrange a controlled purchase of methamphetamine from **MIRANDA**. After the call, Affiant reviewed the consensual recording, during which CS-1 told **MIRANDA** he/she would be in possession of a sum of U.S. currency with which to purchase a distribution quantity of methamphetamine the following day. At the conclusion of the call, **MIRANDA** instructed CS-1 to confirm with him when CS-1 was in possession of the U.S. Currency.

14) Later the same day, CS-1 received a series of text messages from **MIRANDA** directing CS-1 to make sure he/she was ready to conduct the purchase of methamphetamine the following day. **MIRANDA** further instructed CS-1 tell him when CS-1 was in possession of the money and stated he would not mention CS-1 wanting to purchase the methamphetamine to "The Vato" (**MIRANDA's** methamphetamine supplier) until CS-1 had money in hand. CS-1 confirmed the text messages and advised he/she would notify **MIRANDA** when he/she had the U.S. currency the following day.

15) On or about August 21, 2019, Affiant and FBI SAs and TFOs utilized CS-1 to conduct a controlled purchase of methamphetamine directly from **MIRANDA** at his residence. Prior to the meeting, Affiant and another FBI SA met with CS-1 and provided him/her with a quantity of U.S. Currency and a recording device to capture the meeting on a consensually monitored recording. CS-1 and his/her vehicle were also searched to ensure no contraband or large sums of money were present. Nothing was found during these searches.

16) During the controlled purchase of methamphetamine, SAs and Detectives conducted surveillance and observed CS-1 meeting with **MIRANDA** at his residence. Affiant listened to a live-monitoring device and overheard CS-1 and **MIRANDA** discussing the purchase

7

of methamphetamine. After CS-1 gave **MIRANDA** the money (FBI drug evidence purchase funds), **MIRANDA** was overheard speaking on the telephone with a third party confirming he was in possession of the money. Within minutes of this call, surveillance team members observed a truck registered to **Alexis TIRADO** circle the neighborhood and park on an adjacent street away from view of **MIRANDA's** residence. The driver of the vehicle, described as a heavy-set Hispanic male fitting the description of **TIRADO**, got out of the truck and walked to **MIRANDA's** residence carrying a piece of clothing. Surveillance team members observed **MIRANDA** give a box to **TIRADO** who then provided the clothing item he was carrying to **MIRANDA** in exchange. **MIRANDA** then went back inside the residence to meet with CS-1 and **TIRADO** walked back to his vehicle carrying the box. TFOs later reviewed known photographs of **TIRADO** and confirmed this was in fact the heavyset male observed meeting with **MIRANDA** during the controlled buy.

17)    Based on my experience and training, Affiant believes the exchange observed by the surveillance team between **MIRANDA** and **TIRADO** was the exchange of money for methamphetamine. CS-1 later confirmed this belief when he/she explained he/she gave **MIRANDA** the money and **MIRANDA** later went outside with the money and a few minutes later returned with the methamphetamine.

18)    After he returned, **MIRANDA** told CS-1 he would store the methamphetamine at the house in order to ensure police were not watching because "The Vato" (**TIRADO**) was nervous and thought he saw undercover police cars in the neighborhood. CS-1 agreed with **MIRANDA**, left the residence and met with Affiant and another FBI SA for a period of time. Surveillance team members continued to conduct surveillance on **MIRANDA's** residence. After meeting with FBI SAs, CS-1 returned to **MIRANDA's** residence and obtained the quantity of methamphetamine directly from **MIRANDA**. Surveillance team members observed CS-1 meet with **MIRANDA** for

8

a short time and then leave the residence. Affiant met with CS-1 immediately after he/she obtained the methamphetamine from **MIRANDA** and recovered the quantity of methamphetamine and recording device from CS-1.

19) The drug evidence obtained from **MIRANDA** was later submitted to the DEA Southeast Regional Laboratory and the following results were provided after they completed testing of the evidence: 334.5 grams of methamphetamine hydrochloride with a purity level of 99% (+/- 6%). The drug evidence along with the recordings of the buy are maintained by the FBI in the Little Rock Evidence Control Room.

20) On or about October 4, 2019, CS-1 again visited **MIRANDA** at the **PREVIOUS RESIDENCE**. After the visit, CS-1 reported that he/she observed multiple firearms and methamphetamine while at the residence.

21) SAs and TFOs continued their investigation of **MIRANDA** and others related to him using various techniques including telephone toll record analysis, surveillance operations and interviews of other witnesses and Confidential Sources.

22) On October 4, 2019, Affiant and other TFOs conducted surveillance of the **PREVIOUS RESIDENCE** and observed the following: A white male with dark hair was observed sitting in a Red Chevrolet pick-up in front of the residence. Through a review of Arkansas License Plate records and Driver's License records, the white male was identified as Calvin Newton, Jr. who is known by law enforcement to be a methamphetamine distributor who lives in Crawford County, Arkansas. A bronze Nissan Altima registered to **TIRADO** arrived at the residence. **MIRANDA** was observed exiting the passenger side of the vehicle and walking to the residence. Shortly thereafter, **NEWTON** was observed following **MIRANDA** into his residence.

9

Approximately 10 minutes later, **NEWTON** was observed walking out of the residence, returning to his vehicle and leaving the area.

23)     After observing **NEWTON** at **MIRANDA's** residence, Affiant spoke with a Crawford County Sheriff's Office (CCSO) Deputy familiar with **NEWTON**. The Deputy advised he had recently received information from a subject incarcerated within the CCSO Jail that **NEWTON** was distributing methamphetamine from his residence in Crawford County, Arkansas.

24)     Based on my experience and training and my knowledge of this investigation, Affiant believes **NEWTON** was at **MIRANDA's** residence to obtain a supply of methamphetamine from **MIRANDA**. Through the previous controlled buy and other investigative methods, Affiant believes **TIRADO** supplies distribution quantities of methamphetamine to **MIRANDA** who then distributes the methamphetamine. When **MIRANDA** arrived to the residence as a passenger in a vehicle registered to **TIRADO**, Affiant believes **MIRANDA** was bringing methamphetamine supplied to him by **TIRADO** to his residence. Further, Affiant knows drug distributors like **MIRANDA** who use their houses to keep and sell supplies of drugs often have distributors come to the residence to obtain the supplies (as **MIRANDA** did during the August 2019 controlled buy). Therefore, Affiant believes the purpose of **NEWTON's** approximately ten-minute visit to the **PREVIOUS RESIDENCE** was to obtain methamphetamine directly from **MIRANDA**.

25)     On or about October 9, 2019, a surveillance "pole" camera was installed within view of the external area of **MIRANDA's PREVIOUS RESIDENCE**. This camera was utilized to continue surveillance of the residence. During review of pole camera footage, Affiant observed more vehicles making quick stops at the residence, coming, staying for a period of time and then leaving at various times of day. Based on my experience and training, Affiant believes the activity

10

observed at the **PREVIOUS RESIDENCE** is consistent with activity at a house used for drug distribution. Further, Affiant was able to identify multiple subjects who were coming and going from the residence who have criminal histories which include drug trafficking and distribution offenses.

26)     On or about November 6, 2019, Affiant conducted toll record analysis of **MIRANDA's** telephone number (479-650-0459) and identified a frequent caller as **Brandon MCMILLON**, a subject who at the time was found to be under active supervision by the Arkansas Department of Corrections (ADC) parole office in Fort Smith, Arkansas and has a history of drug related arrests in the state of Arkansas. According to **MCMILLON's** parole officer, **MCMILLON** failed a urinalysis for methamphetamine in his previous visit (contemporaneous to this identification). Upon reviewing pole camera footage, Affiant observed **MCMILLON** frequenting **MIRANDA's** residence for short periods of time at various times of day and night which Affiant knows to be consistent with drug transactions.

27)     On or about November 15, 2019, Affiant and TFOs conducted surveillance of **MIRANDA's** residence and observed **MCMILLON** arriving at the **PREVIOUS RESIDENCE**, walking between the residence and his vehicle multiple times then return to his car and leave the area. Due to traffic in the area, surveillance was terminated. Based on my experience and training and knowledge of this investigation, Affiant believes **MCMILLON** was at **MIRANDA's** residence to obtain a supply of methamphetamine from **MIRANDA**.

28)     On or about December 5, 2019, Affiant interviewed Confidential Source 2 (CS-2) who was in custody of the Sebastian County Sheriff's Office for drug and weapon violations and who agreed to cooperate with law enforcement in effort to lessen any sentence imposed for his/her crimes. During this interview, CS-2 identified 2721 Neis Street, Fort Smith, Arkansas as a "stash

11

house" utilized by **Israel MIRANDA-ZAPATA, aka RAYO** (hereafter referred to as **"RAYO"**) and others. Through my investigation, Affiant knows **RAYO** is the brother of **MIRANDA**. CS-2 knows this location was utilized as a "stash house" because he/she has visited the residence to conduct drug transactions with **RAYO**. Affiant reviewed the GPS/precision location data seized during the prior GPS/precision location seizure for one of **MIRANDA's** phones (Case Number: 2:19 CM 46) and was able to confirm 2721 Neis Street as a residence frequented by **MIRANDA**.

29)    On or about January 6, 2020, Affiant interviewed Confidential Source 3 (CS-3) who agreed to cooperate with law enforcement in attempts to lessen any potential sentence for a recent drug trafficking arrest. CS-3 identified **RAYO** as a multi-pound drug distributor and stated he/she would be able to conduct controlled drug purchases directly from **RAYO** at his residence in Fort Smith, Arkansas. CS-3 further identified **RAYO** as the brother of "Manuel" (**Emmanuel MIRANDA**) and stated he/she knew **MIRANDA** and **RAYO** were involved in methamphetamine trafficking and distribution activities together.

30)    On or about January 24, 2020, CS-1 contacted Affiant to advise **MIRANDA** had moved from his previous residence to **1210 North 46th Street, Fort Smith, Arkansas** (the **"SUBJECT PREMESIS"**). On or about January 23, 2020, CS-1 was present at the **SUBJECT PREMESIS** with **MIRANDA**. While he/she was with **MIRANDA** at the **SUBJECT PREMESIS**, CS-1 overheard **MIRANDA** talking to another (unknown) individual. **MIRANDA** was waiting for the unknown individual to arrive at the **SUBJECT PREMESIS** to purchase an unknown quantity of methamphetamine from **MIRANDA**.

31)    On or about February 3, 2020, CS-3 stated he/she has observed **Jason DILL** in possession of at least 11 ounces of methamphetamine within the past week which was supplied to **DILL** by **MIRANDA**. CS-3 has learned from conversations with **DILL** and others that

12

**MIRANDA** was distributing large quantities of methamphetamine to multiple drug customers throughout the Fort Smith, Arkansas area. CS-3 stated he/she further knew **DILL** and others would travel to meet **MIRANDA** at his residence (the **SUBJECT PREMESIS**) to conduct drug these transactions. CS-2 did not know the address for **MIRANDA's** residence but, through my investigation, Affiant knows CS-2 was referring to the **SUBJECT PREMESIS**.

32)     On February 10, 2020, the Honorable Magistrate Judge Mark E. Ford seated in the Western District of Arkansas issued a Search and Seizure Warrant for the GPS precision location data and other information related to the telephone which was being used by **MIRANDA** to coordinate and conduct drug distribution and trafficking activities within the Western District of Arkansas (WDAR Case Number: 2:20 CM 11). This warrant was served and GPS/data location was gathered by the FBI as a result of the search warrant.

33)     On the same date, a pole camera was installed within view of the front of the **SUBJECT PREMESIS**. This pole camera was utilized to assist SAs and TFOs with surveillance of **MIRANDA's** drug trafficking and distribution activities at the **SUBJECT PREMESIS**.

34)     On or about February 12, 2020, Affiant and TFOs utilized CS-3 to conduct a controlled purchase of methamphetamine directly from **RAYO** at his residence. Prior to the meeting, Affiant and a TFO met with CS-3 and provided him/her with a quantity of U.S. Currency and a recording device to capture the meeting on a consensually monitored recording. CS-3 and his/her vehicle were also searched to ensure no contraband or large sums of money were present. Nothing was found during these searches.

35)     During the controlled purchase of methamphetamine, SAs and TFOs conducted surveillance and observed CS-3 meeting with **RAYO** at his residence. Affiant listened to a live-monitoring device and overheard CS-3 and **RAYO** discussing the purchase of methamphetamine.

13

**RAYO** was then overheard calling an unknown third party and ordering a "mitad" (which through my experience and training, Affiant knows to be the Spanish word meaning "half" and referring to a half pound of methamphetamine) of methamphetamine from the individual. **RAYO** then told CS-3 he was waiting on his brother (**MIRANDA**). Approximately 25 minutes later, surveillance SAs and TFOs observed **MIRANDA** arriving at **RAYO's** residence and walking into the residence. Approximately nine minutes later, **MIRANDA** was again observed leaving the residence. Shortly thereafter, CS-3 was observed exiting the residence carrying a plastic baggie.

36)     Affiant and another TFO met with CS-3 immediately after he/she obtained the methamphetamine from **RAYO** and recovered the quantity of methamphetamine and recording device from CS-3. CS-3 then provided the following information: When he/she arrived at **RAYO's** residence, **RAYO** called his brother, **MIRANDA**, to obtain a half-pound of methamphetamine. CS-3 greeted **MIRANDA** when he arrived at the house and then **RAYO** and **MIRANDA** went to a secluded area of the house. After they both returned to where CS-3 was waiting, **RAYO** provided CS-3 with a quantity of methamphetamine. CS-3 observed **MIRANDA** with at least one-half pound of methamphetamine during the transaction. A third party who was also present during the controlled buy obtained a quantity of methamphetamine directly from **MIRANDA** in the presence of CS-3, as well.

37)     The quantity of methamphetamine purchased from **RAYO** and **MIRANDA** by CS-3 was later submitted to the Drug Enforcement Administration (DEA) Southeast Laboratory for testing which returned the following results: the substance tested positive as Methamphetamine Hydrochloride with a net weight of 105.99 grams +/- 0.01 gram and a purity level of 99% +/- 6% for a total amount of pure substance (Methamphetamine Hydrochloride) as 104.93 grams +/- 6.41 grams.

14

38)     Upon review of the GPS/precision data location for **MIRANDA's** phone for the time period during the controlled buy, Affiant observed **MIRANDA** "pinged" at the **SUBJECT PREMESIS** prior to the phone call with **RAYO**. The next "ping" showed **MIRANDA** traveling to his brother's residence where the buy took place.

39)     Affiant also utilized pole camera surveillance of both **RAYO's** residence and the **SUBJECT PREMESIS** during the controlled buy. Of note, Affiant observed **MIRANDA** leaving his residence after **RAYO** told CS-3 he was waiting on his brother and prior **MIRANDA** arriving at **RAYO's** house to conduct the drug transaction

40)     Based on the meeting, overheard telephone conversation between **RAYO** and the unknown third party ordering a "half", the pole camera surveillance and **MIRANDA's** phone GPS/data location "pings", Affiant believes **MIRANDA** was in possession of the half-pound of methamphetamine at his residence. When **RAYO** ordered the quantity of methamphetamine, **MIRANDA** agreed to provide it to him and traveled to **RAYO's** residence in possession of the methamphetamine to distribute it to CS-3, **RAYO** and the third party.

41)     On or about May 26, 2020, Affiant interview CS-1 who advised he/she had recently spoken with **MIRANDA** who told CS-1 there is a methamphetamine shortage in Fort Smith due to the COVID-19 crisis; however, **MIRANDA** further stated he is expecting to receive a large quantity of liquid methamphetamine which will then be converted to crystal methamphetamine for distribution. **MIRANDA** explained certain chemicals are added to the liquid methamphetamine to convert it to crystal form.

42)     On or about June 24, 2020, Affiant interviewed CS-1 who advised **MIRANDA** continues to distribute quantities of methamphetamine from his residence in Fort Smith, Arkansas. CS-1 provided **MIRANDA's** current working number as (512) 917-9743. CS-1 also stated that

15

he/she observed **MIRANDA** in possession of stolen items at his residence which he had received from drug customers as payment for supplies of methamphetamine. CS-1 stated he/she observed at least four security cameras on the exterior of **MIRANDA's** residence (the **SUBJECT PREMESIS**) while he/she was there.

43)  On June 24, 2020, Affiant utilized administrative subpoena powers to obtain subscriber information and toll records for the (512) 917-9743 and discovered the following: It is subscribed to **Emmanuel MIRANDA** with an address in Fort Smith, Arkansas. This phone was activated on June 3, 2020 and is currently in service.

44)  On or about June 30, 2020, Affiant met with CS-1 who provided the following information: He/she visited **MIRANDA** at the **SUBJECT PREMESIS** on June 27, 2020. While CS-1 was present at **MIRANDA's** residence, **MIRANDA** told CS-1 he was in possession of a supply of methamphetamine which he offered to sell to CS-1. **MIRANDA** also told CS-1 he still had firearms at his residence (the **SUBJECT PREMESIS**). Affiant knows **MIRANDA** has previously offered to sell CS-1 firearms and believes this is why **MIRANDA** told CS-1 about currently possessing firearms.

45)  On or about July 13, 2020, Affiant conducted surveillance of **MIRANDA's** residence in Fort Smith, Arkansas. During this surveillance, Affiant observed a red Ford Ranger pick-up stopped at the residence for a short period of time and then leave the residence. The pick-up was then observed stopped at a nearby stop sign for an unusually long period of time before it turned onto Grand Avenue. After turning onto Grand Avenue, the pick-up drove off at a high rate of speed through traffic. Affiant attempted to follow the truck to obtain the license plate number from it but was unable to catch up to the pick-up due to the high rate of speed at which it was traveling. The vehicle was observed traveling in the left (inside lane) of Grand Avenue

16

approaching the intersection of Grand Avenue and Highway 540 when it suddenly changed lanes, crossing traffic in the right (outside) lane to enter Highway 540 and speed off.

46) Based on my experience and training, Affiant believes the red Ford Ranger was at **MIRANDA's** residence to conduct a drug transaction and, when the driver left he/she observed Affiant's vehicle and grew suspicious that he/she was being followed by law enforcement. Affiant believes the erratic and dangerous manner in which the driver of the pick-up was operating his/her vehicle indicates counter-surveillance techniques often employed by those who are engaged in illegal activities. Affiant believes the way the vehicle paused at the stop sign, sped through traffic and then cut-off other cars to make an abrupt lane change all indicate the driver of the red Ford Ranger was attempting to and did, in fact, evade law enforcement by driving dangerously through traffic after leaving a known location where drugs are kept and sold.

47) On July 28, 2020 a Federal Grand Jury seated in the Western District of Arkansas issued a True Bill Indictment for **Emmanuel MIRANDA** and others based on his participation in a Drug Conspiracy in violation of Title 21, USC § 846 and Distribution of 500 Grams or More of Methamphetamine in violation of Title 21 USC § 841.

## Conclusion

48) During Affiant's law enforcement experience, I have participated in numerous search warrants of residences, businesses, stash locations and third-party dwellings used by individuals involved in organizations engaged in the distribution of illegal drugs.

49) During the course of these search warrants, Affiant has learned that individuals involved in criminal enterprises that distribute illegal drugs often rely on documentation that they create, receive, send or keep which records vital information pertinent to the operations of the criminal organization they manage. This information may include: names, phone numbers and

17

addresses of individuals who are drug customers, distributors. traffickers, suppliers and others participating in the organization's criminal activities; as well as notes, ledgers computerized spreadsheets documenting dates, times, involved parties. amounts of money and/or illegal drugs involved in the distribution of illegal drugs; identifying information relating to accounts and account numbers for financial services (such as wire transfers, saving and/or checking accounts, stored-value debit cards. etc.) and institutions used to launder illegal drug proceeds by the director and subordinates of an illegal drug trafficking organization.

50) Additionally. in the course of my training and experience. Affiant has learned that individuals who manage and are responsible for large quantities of illegal drugs meant for distribution and large sums of money which represents proceeds from the sales of illegal drugs or future payment for a supply of drugs. often possess firearms. Affiant has learned the managers or directors who are responsible for large supplies of illegal drugs or large amounts of money possess firearms in order to protect themselves. the organizations money and drugs in an effort to deter others from robbing them.

51) Affiant has also learned that individuals involved in illegal DTOs may frequently possess and use firearms in order to harm. intimidate and coerce individuals to collect drug proceeds owed to the organization or to deter competitive efforts by other individuals or organizations who also traffic illegal drugs.

52) Based on my training and experience. Affiant knows individuals engaged in continuing criminal enterprises whose main goal is to traffic. manufacture. possess. conceal and distribute methamphetamine and other illegal drugs often attempt to distance themselves from their stores of illegal drugs. namely methamphetamine, in "stash" locations owned or managed by third parties in order to evade law enforcement detection and disruption of the organization's drug trade.

18

At times, these drug stores are maintained at the stash locations unbeknownst to the residence or business owner.

53) Further, Affiant knows such individuals often deal in large quantities of cash currency and maintain large stores of cash currency representing the proceeds of their illegal drug trafficking and distribution activities. This cash currency can also represent drug debts owed to the DTO's supplier(s). Affiant knows this cash currency is commonly maintained, stored and concealed in the residences of individual DTO members or third party residences and businesses, including houses belonging to family members or businesses owned by other individuals, in order to conceal their ill-gotten gain from law enforcement detection. Much of the time these cash stores are maintained at residences and businesses unbeknownst to the residence or business owner.

54) During his experience, Affiant has assisted on the execution of search warrants at the residences and places of business of individuals who direct and/or manage illegal drug trafficking organizations. During these searches, Affiant has learned individuals responsible for directing the activities of an illegal drug trafficking organization rely on the use of equipment or "tools of the trade" in order to operate the organization efficiently. These "tools of the trade" frequently include computers, cellular telephones, notes and/or ledgers recording information that indicates the identities of other involved co-conspirators and methods of money laundering and firearms. In the prior cases, documentation found in notes, ledgers, documents in computers and cellular phones were found to contain evidence identifying the rightful owner of the devices, history of communication and records relating to criminal activities and involvement in criminal activity.

55) Affiant knows from training and experience that searches and seizures of evidence from computers and cellular phones require Agents/TFOs to seize most or all items (hardware,

19

software, passwords and instructions) to be processed later by a qualified computer expert in a laboratory or other controlled environment. Computer storage media which can be accessed by cellular phones or other devices to store or retrieve data can store the equivalent of thousands of pages of information. This storage medium includes but is not limited to: flash memory cards, compact flash cards and other similar storage medium, USB mini storage devices, micro hard drives, external hard drives internal hard drives, and optical or mechanical storage.

56)     Affiant knows from training and experience that searching computers and cellular phones for criminal evidence requires experience in the computer field and a properly controlled environment in order to protect the integrity of the evidence and recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (from external sources or from destructive code imbedded in the system as a "booby trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis. Affiant or other assisting Investigators from the FBI may however conduct a preview examination of the suspect's computer(s) and cellular telephone(s) on-site using hardware and software that will not alter or change any potential evidence located on the said items.

57)     Based on my training and experience, Affiant knows computers and cellular telephones can contain a substantial amount of information relevant to the investigation of a criminal organization. Criminals often use computers and cellular phones to communicate with accomplices and will sometimes store accomplices' contact information in address books, speed dial lists or in other areas of the phone. These communications can occur through typical telephone calls or through instant messaging or text messages. To the extent that criminals use services such as instant messaging or text messages, these messages can sometimes be found on the cellular

20

phone itself. Further, criminals also use cellular phones to document criminal activities with photographs, videos and digital memos. Your Affiant knows that these images and memos are also stored on the handset itself and can also be maintained or back-up on a cloud-based computer server which is located off-site (such as iTunes, iCloud, etc.). Also information can be located on the SIM (Subscriber Identity Module) which is a smart card located in the phone which also contains network information. Removable memories, such as but not limited to, flash cards, are also sometimes located in a cellular handset that allows the user to store vast amounts of electronic data.

58)     Affiant knows devices such as these computers and phones can store large amounts of information such as: phone numbers and call history and some mobile phones can also contain contact information and calendar information and can be linked, either by wire or wireless, with computers. Further, cellular telephones commonly contain cameras which produce and store images in digital format. This information can be valuable evidence in determining other participants in a criminal enterprise.

59)     Likewise, your Affiant knows that images contained in a cellular telephone taken with the device's camera function can contain evidence of where a subject has been and with whom the subject has associated.

60)     Affiant knows from training and experience that search warrants of computers and cellular phones involved in a criminal offense usually produces items that would tend to establish ownership or use of cellular phones and ownership or use of any Internet service accounts, to include credit card bills, telephone bills, correspondence and other identification documents. Therefore, Affiant asserts probable cause exists to seize and search cellular telephones, portable devices and other computers or electronic media found during the execution of the requested search

warrant and requests the search warrant include the search or "download" of seized items as well as the examination of such downloads for evidence related to the crimes enumerated herein.

61)    In light of the above information, Affiant believes probable cause exists to believe that at the addresses of:

- **1210 N. 46th Street, Fort Smith, Arkansas**

(which are further described in Attachment "B" of this Affidavit) there is now evidence, listed on Attachment "A" of this Affidavit, fruits and instrumentalities showing **Emmanuel MIRANDA** and others are engaged in a Conspiracy in violation of Title 21, USC § 846 and Possession with Intent to Distribute 500 Grams or More of Methamphetamine in violation of Title 21 USC § 841.

MATTHEW FERGUSON
Digitally signed by MATTHEW FERGUSON
DN: c=US, o=U.S. Government, ou=Dept of Justice, ou=FBI, cn=MATTHEW FERGUSON, 0.9.2342.19200300.100.1.1=150 01003524046
Date: 2020.08.03 14:04:48 -05'00'

Matthew K. Ferguson
Special Agent
Federal Bureau of Investigation
Fort Smith, Arkansas

Subscribed and sworn to before me this _3rd_ day of August, 2020.

Mark E. Ford

Hon. Mark E. Ford
United States Magistrate Judge

22